**CERMELE & WOOD LLP**
*Attorneys for Plaintiffs*
2 Westchester Park Drive
Suite 110
White Plains, New York 10604
Tel. (914) 967-2753

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STEVEN P. D'ANGELO, STEVELINE, INC., SPG SHERIDAN GROUP LLC, and LAWRENCE RUBIN, <br><br> *Plaintiffs*, <br><br> v. <br><br> ARTHUR D'ANNUNZIO, JEWELRY DESIGNER SHOWCASE, INC., PPAD INC. & ASSOCIATES, PAUL JOSEPH DeVITO, DeVITO & DeVITO, P.C., SEAN WILLIAMS, WILLIAMS & FOSTER CONSULTING GROUP, LLC, and DAVID ROSENBLUM, <br><br> *Defendants*. | Case No. <br><br> **COMPLAINT** <br> <u>**WITH JURY DEMAND**</u> |

## <u>INTRODUCTION</u>

Plaintiffs Steven P. D'Angelo ("D'Angelo"), Steveline, Inc. ("Steveline"), SPG Sheridan Group LLC ("SPG"), and Lawrence Rubin ("Rubin" and together with D'Angelo, Steveline, and SPG, the "Plaintiffs") by their attorneys Cermele & Wood LLP, complaining of the above-named defendants (collectively, the "Defendants"), respectfully allege as follows:

1.     Jewelry Designer Showcase, Inc. ("JDS") purports to be a designer, manufacturer and wholesaler of mid-price and high-end jewelry items, and trader in precious metals and gemstones.  However, JDS is just the latest in a series of scam companies run by Arthur D'Annunzio ("D'Annunzio").  On the one hand, D'Annunzio repeatedly boasts to shareholders like Plaintiffs that orders are exceeding JDS's projections regardless of the world economy, the

pandemic, or any other externality that affects businesses, yet JDS always seems to be cash-strapped and thus solicits shareholders to refer friends and family to "invest" in JDS.  Here, D'Annunzio treated D'Angelo like an ATM.  In the process, D'Annunzio took millions of dollars from D'Angelo that have not been repaid, and D'Angelo's efforts to wind down the relationship between Plaintiffs, JDS, and D'Annunzio have been fruitless.

2.      Broadly, Defendants' fraudulent scheme works in the following way.  Potential "investors" are let in on an "opportunity" that seems like a dream come true.  They are told that if they invest in, for example, 5,000 shares of JDS, their investment will multiply when—not if—JDS goes public or is purchased by another company.   Investors are told that this is a "friends and family only" opportunity to invest in a "family company" that has been around since 1955, and that D'Annunzio is the third generation to head up this family business.  The overall effect is to induce investors like Plaintiffs to rely upon statements promising astronomical returns to a supposedly select group of individuals from a company that is longstanding and stable.

3.      Moreover, D'Annunzio and defendant Sean Williams ("Williams") coupled the foregoing statements with other knowing misrepresentations intended to prevent existing investors from seeking the return of their funds.  Indeed, during the time period covered by this complaint, Plaintiffs were told—falsely—that JDS was about to be purchased by LVMH Moët Hennessy Louis Vuitton, Berkshire Hathaway, and 1-800 Flowers, among other famous jewelry and luxury brands.  Plaintiffs relied on these statements to not demand redemption of their shares and Rubin rescinded redemption requests based on these and other misrepresentations.

4.      The foregoing statements are untrue, and Defendants know them to be untrue.  Investment in JDS is not a "friends and family only" opportunity.  It is open to all and any whom D'Annunzio and Williams believe have money they can siphon into their pockets.  Moreover, JDS

has not been around since 1955.  It was incorporated only in 2010.  Finally, Defendants all knew, or should have known at the time they solicited Plaintiffs and other investors, that the chance of JDS going public was zero, given (among other "red flags") D'Annunzio's and his brother Philip D'Annunzio's (together with D'Annunzio, the "D'Annunzio Brothers") checkered business history, and the fact that JDS has been issuing securities through Williams and Williams & Foster Consulting Group, LLC ("WFCG"), neither of whom are registered broker-dealers.  Nor is there any realistic chance of JDS being purchased at a premium given its constant cash flow crises and apparent mismanagement.

5.     To effectuate these transactions, Williams and WFCG complete "accredited investor questionnaires" on behalf of unaccredited investors.  Miraculously, every single person who wants to invest in JDS becomes an "accredited investor," once Williams and WFCG have completed the paperwork.  If the investor is "lucky," this paperwork, and sometimes a private placement memorandum with a heading dated 2011, is presented to the investor simultaneously with the wiring of funds to JDS (or PPAD Inc. & Associates ("PPAD") in some cases).  However, many times, the Private Placement Memorandum, or PPM, is not provided to the investor, and the accredited investor questionnaire is backdated to appear as though it was signed before funds were wired.  In all cases, however, investors are not given the opportunity to conduct appropriate diligence that could uncover Defendants' history of multi-million-dollar lawsuits against companies they owned that subsequently folded.

6.     Once Defendants receive an investor's money, they stall redemption requests, and double down on their fraud by promising even greater returns on investment.  For example, in April 2022, Williams told Rubin that JDS had received two offers to be bought out, that it was in discussions to be purchased by Berkshire Hathaway, and they were "close" to having a deal

finalized, and therefore it would be foolish to redeem his shares now. However, Williams' statement was false when made, and Williams knew the statement to be false when he made it to dissuade Rubin from pursuing his request to redeem his shares of JDS. Williams' misrepresentation to Rubin convinced Rubin to withdraw his then-pending redemption request.

7. In addition to stalling redemption requests, D'Annunzio targeted a select group of investors to further swindle. Specifically, D'Annunzio lured investors such as D'Angelo to transfer money to defendant PPAD, a corporate affiliate of JDS, where D'Angelo was told his money was being used to participate in short-term investments in gemstones and precious metals called "flips." As bait, D'Annunzio promised profits ranging from 30% to 400% in a matter of weeks. Yet, when flip participants such as D'Angelo sought the return of their principal and profit, they were either (i) stonewalled and funds were not returned or (ii) they were pressured to convert the principal and profits to JDS stock, based on the lie told innumerable times by D'Annunzio and Williams that JDS was about to be purchased or go public, and thus the shareholder would be richly rewarded for his patience and cooperation.

8. Thus, not only did D'Annunzio and his companies defraud Plaintiffs upon the purchase of shares in JDS, but D'Annunzio doubled-down on this fraud, by soliciting funds for "flips" that he had no intention of repaying. Instead, he simply took the money D'Angelo wired to PPAD, and issued non-tradeable shares in a company that appears to be a long-running Ponzi scheme that began shortly after predecessor companies to JDS went belly-up. Additional details about this fraudulent scheme are articulated in below in Section A of the Factual Background.

9. Paul Joseph DeVito ("DeVito") and his law firm, DeVito & DeVito, P.C. ("D & D"), enable and assist in this fraudulent scheme. DeVito is D'Annunzio's, JDS's, and PPAD's *consigliere*. In that role, DeVito and his law firm issue legal threats to restive shareholders, advise

the other defendants how to continue to perpetrate their fraud, and stall redemption requests. Moreover, upon information and belief, D&D has participated in drafting various documents used to perpetuate the frauds described herein such as stock subscription agreements, and has, at D'Annunzio's direction, quarterbacked the issuance of unregistered securities by unregistered broker-dealers.

10.     Additionally, DeVito was the attorney who represented D'Angelo, D'Annunzio, and others in a land deal on Staten Island.  Having put together this land deal for his clients, DeVito, while acting simultaneously as D'Annunzio's, JDS's, and PPAD's attorney, induced D'Angelo to invest millions of dollars into JDS and engage in business transactions with DeVito.  Such investments and transactions, using only D'Angelo's money, personally benefited DeVito.  At no time did DeVito or anyone else at D&D advise D'Angelo to seek independent counsel of his choice to review these transactions.  Rather, while watching the Minneapolis Miracle Football game on January 14, 2018, Tom DeVito Sr. of D&D told D'Angelo to "stick with Artie [D'Annunzio], he's going to make you a lot of money."

11.     Plaintiffs have, for many months, demanded, and attempted to negotiate, their exit from this unfruitful investment having most of the earmarks of a Ponzi scheme by redeeming their shares.[1]  Apart from accusations of disloyalty and pointed reminders of their non-disclosure agreements, Plaintiffs' demands (including demands for books and records that Plaintiffs are entitled to see by law) have been met with delay upon delay, and the clear, if not forthrightly stated, message that (despite repeated claims of business booming) their shares will not be redeemed anytime soon.  Regrettably, Plaintiffs have been left with no choice but to commence this lawsuit.

---

[1] In the meantime, Plaintiffs have entered into a tolling agreement with Defendants that has been extended through and including the date of filing of this Complaint.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, insofar as Plaintiffs allege violations of the United States securities laws, namely Sections 5(a) and 5(c) of the 1933 Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c); Section 15(a) of the 1934 Exchange Act, 15 U.S.C. § 78o(a); Section 17(a) of the Securities Act, 15 U.S.C.  § 77q(a); Section 10-b of the Exchange Act, 15 U.S.C. § 78j(b), and Securities and Exchange Commission Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

13.      Pursuant to 28 U.S.C. § 1367, the Court's supplemental jurisdiction extends to the additional, closely-related common-law claims for relief set forth below.

14.     Venue is proper in this district, pursuant to 28 U.S.C. § 1391(b).

## PARTIES

15.     Plaintiff Steven P. D'Angelo is a natural person residing in Bethpage, New York.

16.     Plaintiff Steveline, Inc. is a New York corporation, with an address in Bethpage, New York.  At all times herein, D'Angelo was and is the owner of all of the outstanding shares of Steveline.

17.     Plaintiff SPG Sheridan Group LLC is a New York limited liability company having an address in Bethpage, New York.  D'Angelo is a managing member of SPG, and is the sole source of its capitalization.  SPG's other members are DeVito and non-party Gerard Graci ("Graci").  Neither DeVito nor Graci contributed any funds to SPG.

18.     Plaintiff Lawrence Rubin is a United States citizen who currently resides abroad.

19.     Defendant Arthur D'Annunzio is a natural person who resides in Staten Island, New York.  D'Annunzio has an office at 4366A Victory Boulevard, Staten Island, New York 10314.

20.     Defendant Jewelry Designer Showcase, Inc. is a Delaware corporation with an office located at office at 4366A Victory Boulevard, Staten Island, New York 10314.  D'Annunzio

is the president and (prior to the subject private placement) owned 50% of the issued and outstanding shares of JDS. D'Annunzio's brother, Philip D'Annunzio, is vice-president and owns a like amount of JDS's issued and outstanding shares. The D'Annunzio brothers remain firmly in control of JDS.

21. Defendant PPAD Inc. & Associates was organized as a domestic corporation in 2010 and, at relevant times herein, was controlled by D'Annunzio. On numerous occasions, D'Angelo or Steveline, at D'Annunzio's direction, wired funds to bank accounts in the name of PPAD, thereby making use of the banking system, a facility in interstate commerce. On at least one occasion in 2020, funds paid to a nonparty investor in JDS to redeem her shares were remitted by check from an account of PPAD.

22. Defendant Sean Williams is a natural person residing, upon information and belief, in Bronx, New York, and owns, dominates, and controls Williams & Foster Consulting Group, LLC. At all relevant times herein, Williams has used WFCG to conduct fraudulent transactions with respect to the purchase, sale, and transfer of securities in JDS. Moreover, as WFCG was touted, falsely, as an entity licensed to transfer the shares being transferred, it is noteworthy that in a sworn affidavit dated December 15, 2020, D'Annunzio identified Williams as an employee of JDS.

23. Defendant Williams & Foster Consulting Group, LLC is a domestic limited liability company, having its principal place of business at 3030 Middletown Rd., Apt. 5H, Bronx, New York 10461. Upon information and belief, WFCG's office address is a residential apartment, and the current or recent abode of Williams, whose primary source of income is, upon information and belief, compensation for employment as an employee of JDS, and member of JDS's management team.

24.     Defendant David Rosenblum ("Rosenblum"), upon information and belief is a resident of New Jersey, and is an accountant who routinely performs accounting services in New York, transacts business with D'Annunzio in New York, including in connection with the fraudulent scheme alleged herein.

25.     Upon information and belief, there were and there continue to be frequent, indeed routine, interstate telephone and text message communications between D'Annunzio and Rosenblum, and Williams and Rosenblum, in furtherance of the scheme alleged herein.

26.     Defendants, Paul Joseph DeVito, Esq., a New York attorney, and the Staten Island law firm of DeVito & DeVito, P.C., of which he is a member, are named as defendants for, *inter alia*, securities fraud, fraudulent inducement, aiding and abetting fraud, breaching their fiduciary duties to D'Angelo, and aiding and abetting D'Annunzio's breach of his fiduciary duties to Plaintiffs, as they took part in drafting and reviewing the agreements and papers used in the illicit transactions, knowing or having reason to know that the same were unlawful and fraudulent, and bullying shareholders who threatened, expressly or impliedly, to blow the whistle on the wrongdoing of the other defendants.

## FACTUAL BACKGROUND

### A. D'Annunzio's Checkered Past Results in the Creation of JDS

27.     In or about 2009, the predecessor entities through which D'Annunzio and his brother Philip D'Annunzio operated the family's fine jewelry business (D'Annunzio Distribution, Inc., incorporated in New Jersey in 2005, and D'Annunzio Dealers, Inc. incorporated in New York in 2003) obtained $19 million in financing and factoring arrangements with Capstone Business Credit, LLC and an affiliate.  The companies' obligations were guaranteed by each of the D'Annunzio brothers.

28.     According to a complaint in the Supreme Court, New York County in *Capstone Business Credit, LLC, et al. v. D'Annunzio Distribution, Inc., et al.,* (Index No. 602439-2009) these D'Annunzio entities (themselves only a few years old) defaulted under their agreements with the Capstone entities, in amounts totaling over $24 million.  Shortly after that litigation was settled, the current entity, Jewelry Design Showcase, Inc., was organized as a Delaware corporation on December 8, 2010.

29.     It appears that, following the *Capstone* fiasco, defendants honed their skills as fraudsters.  Rather than take on factoring agreements or debt, it appears that defendants incorporated a new entity, JDS, and had a private placement memorandum, stock subscription agreements, and other legal documents drafted, including a non-disclosure agreement defendants have wielded to hide their fraudulent scheme.  The goal, obviously, was to raise money (up to $30 million) from the public at large in a private placement of unregistered securities (and regardless of whether the investors were truly accredited).

**B.  Representations Made to JDS Investors Generally, Including Plaintiffs**

30.     In presentations to prospective investors, including materials sent to Plaintiffs, D'Annunzio and his team bragged about the business's history dating from 1955 in an attempt to demonstrate a lack of risk in the investment, and to discourage investors from uncovering information about D'Annunzio Distribution Inc., and D'Annunzio Dealers, Inc.  A copy of this presentation was given to D'Angelo in February 2017, following a lunch meeting between himself and D'Annunzio that DeVito arranged.  This presentation also showed a made-up track record of JDS topping its projected sales by nearly 100% year after year, in a further effort to convince a prospective investor that JDS was a rapidly growing company whose success would result in a substantial return on investment.  However, as detailed below, JDS was nearly always strapped for

cash, and had no chance of being bought out or being publicly offered.  Moreover, the presentation given to D'Angelo and other prospective investors did not contain any disclaimers whatsoever even though it was obviously intended to induce investment into privately-held JDS.

31.    D'Annunzio, as well as Williams and Rosenblum, in pitching purchases of JDS stock, including to Plaintiffs, consistently represented that JDS would be sold in 2019 (or 2020), and that investors were guaranteed to make "at least four times" their investment.

32.    Defendants knew the foregoing representations were false when made, as D'Annunzio's prior jewelry companies had defaulted in approximately $24 million in obligations (which defaults would assuredly be uncovered by any potential suitors if given time to perform due diligence) and, as of 2017, D'Annunzio, then in his early fifties and probably too old to undertake a radically different line of work (and too young to retire) had no intent to sell JDS or take it public.  Rather, D'Annunzio, JDS, and PPAD are engaged in a fraudulent scheme to raise funds that they then mostly pocket rather than use to grow JDS, as represented repeatedly, but falsely, to shareholders such as Plaintiffs.

33.    In furtherance of Defendants' scheme, D'Annunzio, Williams, DeVito, and D&D, drafted and exchanged, via the mails or the instrumentalities and means of interstate commerce, numerous documents, including unregistered, non-tradeable security instruments, which lacked the legends (*i.e.,* that the shares represented by the certificates were unregistered and non-tradeable) required by law.  In addition to which, numerous documents (such as subscription agreements, the private placement memorandum, the accredited investor questionnaire and non-disclosure agreements required by JDS) and additional promotional materials, were sent or caused or directed by Defendants to be sent to prospective investors, and/or were returned to JDS or its

agents following execution, via the U.S. Postal Service, or other means and instrumentalities in interstate commerce.

34.     As to all funds privately raised by JDS through stock sales from 2017 to date (including but not limited to Plaintiffs' investments) upon information and belief, D'Annunzio, JDS, Williams, WFCG, DeVito, and D&D failed to submit or cause to be submitted any registration statement with the Securities and Exchange Commission for the shares in JDS that they were purporting to issue.

35.     To further effectuate this scheme, Defendants employ high-pressure sales tactics and encourage investment in JDS without time for diligence to be conducted.  The share certificates delivered to Plaintiffs did not bear the required legend that the same were unregistered and non-tradeable.  Moreover, documents such as Stock Subscription Agreements were backdated, persons other than "accredited investors" (including plaintiff Rubin) were encouraged to invest in JDS, and Williams completed accredited investor questionnaires on investors' behalf, without regard for the truth of the information contained therein.

36.     Moreover, JDS has stonewalled its shareholders—including Plaintiffs—from receiving basic financial information concerning JDS and its business, despite the existence of the mandatory non-disclosure agreements, which appear to have the primary purpose of being used to gag JDS investors from disclosing the fraudulent scheme being perpetrated.

37.     Once shareholders had committed funds to purchase shares in JDS, D'Annunzio did not intend to let investors easily redeem their non-tradeable securities, in part because this would undercut his ability to deliver large returns "on paper" to his investors, but more importantly because D'Annunzio, upon information and belief, was knowingly running a Ponzi scheme, and intended that JDS and its principals would simply keep the lion's share of the investors' money.

If the private placement were legitimate, the Private Placement Memorandum would have been far more temperate and would have been given to investors such as Plaintiffs with sufficient time to review and conduct due diligence, instead of not given at all or given simultaneously with funds being transferred, D'Annunzio's history and that of the predecessor corporate entities would have been disclosed, conscientious measures to exclude investors other than genuinely accredited investors would have been taken, and a *bona fide* broker-dealer would have been engaged for the program.

38.     By July 2018, D'Annunzio and JDS were beginning to run low on cash to redeem early investors' shares.  Therefore, they asked existing investors to help them find new investors who might want to purchase private shares in JDS at a discount.  Ostensibly, this request was so JDS could make its "minimum sales goal."  To further motivate his investors, D'Annunzio foreshadowed that he would be making an announcement in August 2018 that shares would no longer be able to be purchased at a discount.  In other words, D'Annunzio was promising his existing investors an increased stock price, if they could recruit new investors.

39.     On August 30, 2018, D'Annunzio and JDS continued to urge investors to be patient, claiming that they had not yet met their "minimum sales requirement" of JDS stock to make an announcement, but that there would be an announcement shortly.  Upon information and belief, D'Annunzio wanted JDS's investors to believe that the forthcoming announcement would be of a new, higher share price.

40.     Behind the scenes, however, D'Annunzio was scrambling to keep his fraudulent scheme running, and needed to buy more time to pay early investors back, so he told his investors that he had "stalled" the valuation of JDS, because he wanted to obtain a reserve in shares.  Thus,

D'Annunzio, JDS, Williams and WFCG postponed the date for JDS to supposedly go public, or be purchased, from early 2019 to mid-2019.

41.     During 2019, to keep his investors at bay, D'Annunzio maintained a façade of being too busy with JDS's affairs to pay attention to requests for share redemptions.  For example, he wrote to all of JDS's investors on January 15, 2019 that JDS was "in the process of completing a few steps and will be making any and all announcements upon completion.  The JDS private placement has reached and exceeded every step of our goals . . . We have taken every step in a methodical way and will continue to do so to insure every aspect will be perfectly handled . . . . We are headed for a spectacular 2019 and we will all keep enjoying our journey together." D'Annunzio then directed his investors to contact only Williams or himself with any questions.

42.     D'Annunzio's January 15, 2019 letter contained several false and misleading statements.  For example, JDS's supposed private placement had not, in fact, reached and exceeded every step of its goals, as evidenced by D'Annunzio's prior writing that JDS had not met its minimum sales goal, wherefore the expected announcement of an increased share price had to be delayed.

43.     Moreover, D'Annunzio dodged phone calls and repeatedly professed to be too busy with JDS, and the numerous side deals he referred to as "flips," to answer any substantive questions about redemption of any shares in JDS.  Upon information and belief, the profits from these "flips" were being used, in substantial part, to cover cash needs to pay out some of the initial investors in D'Annunzio's fraudulent scheme.

44.     To further deter his investors from trying to redeem their shares in 2019, D'Annunzio continued to pump up JDS with proclamations of how JDS's best customers speak

highly of JDS to others, and how JDS's training, marketing, and promotional tools were the best in the industry.

45.     Moreover, to forestall any attempt by D'Angelo or his companies to seek a share redemption request, on or about August 10, 2019 DeVito proclaimed to D'Angelo at a small gathering with D'Annunzio that JDS was "going to $400 a share."  Upon information and belief, DeVito conveyed this message at D'Annunzio's direction on behalf of his clients D'Annunzio and JDS.

46.     Defendants' scheme also relies upon recruitment of additional marks by JDS shareholders.  Thus, D'Annunzio has repeatedly made false boasts about JDS's success and overcoming tremendous odds.  For example, on December 9, 2019, D'Annunzio represented via email to shareholders that JDS was shipping "twice as many reorders each day as we did last season" and asked shareholders to refer their friends to become shareholders in JDS.

47.     JDS had no legitimate business need to seek out additional investors at this time; if its sales were booming beyond its then-existing ability to fulfill them, then JDS should have been able to obtain or expand a line of credit to smooth out cashflow.  Thus, D'Annunzio's statement that JDS was shipping "twice as many reorders" was false when made, and D'Annunzio knew it to be false when made.  It was clearly designed to keep shareholders like Plaintiffs from seeking redemption of their shares, and recruit additional money to pay off disgruntled shareholders. [2]

48.     Indeed, unbeknownst to Plaintiffs, at the time D'Annunzio was boasting of JDS's success, it had recently bounced multiple checks written to shareholders to redeem their shares in JDS.

---

[2] D'Annunzio coupled this message with a notice that he was again delaying a public offering of JDS and that "we are going to contact you regarding any referrals you could provide to become JDS shareholders."

49.     Moreover, D'Annunzio's accountant, Rosenblum, texted D'Angelo on December 27, 2019, that he and D'Annunzio were soliciting additional investors that day, and that D'Annunzio and Williams agreed that JDS would reach $200/share.  This text message coincided with a time at which JDS shareholders were increasingly requesting redemption of their shares in JDS.  Naturally, Defendants did not want to also face such a redemption request from D'Angelo or his companies, who, upon information and belief, are among the largest shareholders in JDS aside from the D'Annunzio brothers.

50.     On February 20, 2020, redemption requests continued to mount, and rather than redeem shares in JDS, D'Annunzio asked accountant Rosenblum, who was in charge of the accounting for various flips, and his consigliere DeVito, whether anyone had threatened to sue.

51.     Faced with mounting pressure, on March 9, 2020, D'Annunzio proposed buying back stock from "ungrateful" JDS shareholders who should "no longer [be in JDS]."  At the same time, D'Annunzio exhorted D'Angelo and DeVito to reach out to their contacts for additional investments.  Presumably, these additional investments were needed to buy back stock from investors who were demanding that their shares be redeemed or else they would sue.

52.     Thereafter, in a further attempt to stem the flow of redemption requests, D'Annunzio caused JDS to gift 500 additional shares to each existing shareholder.

53.     Meanwhile, in mid-2020, D'Annunzio asked D'Angelo to prepare an email to him summarizing the amounts transferred for share purchases, flips, and residuals (see below at Points D and E) so that D'Annunzio could confirm amounts owed to D'Angelo in writing.  This request, coupled with D'Annunzio's contemporaneous statements to D'Angelo that he was "on the verge of doing something big" but it may take another year, lulled D'Angelo into a false sense of security that JDS was a legitimate business and that his patience would be richly rewarded.

54.     On July 28, 2020, D'Annunzio confirmed to D'Angelo in writing that all amounts set forth in his prior email summarizing amounts transferred for share purchases, flips, and residuals were correct.

55.     On August 18, 2020, Williams emailed all shareholders an update containing suspect claims, including that JDS had achieved a double-digit percentage increase in distributor openings compared to the same 6-month period in 2019.  This claim is implausible, given that most businesses were shut down during the early months of the COVID-19 pandemic, and thus achieving such growth would have been unlikely indeed.

56.     Other seemingly implausible claims started to surface as well.   For example, despite always seeming to need money, D'Annunzio emailed JDS's shareholders that he had turned down several large companies and investors' requests to become a part of JDS.

57.     If JDS were a legitimate company and in need of capital, it is likely that it would have accepted at least some of this investment.  But it did not do so because, upon information and belief, either the proposals were a falsehood made up by D'Annunzio, or D'Annunzio was unwilling to allow would-be investors to perform their due diligence, which would have uncovered D'Annunzio's and JDS's fraudulent scheme.

58.     Following closely on the heels of these incredible claims, on August 30, 2020—at the height of a global pandemic—D'Annunzio emailed all shareholders that JDS was in the "odd position of excessive growth" and that during 2020, JDS had exceeded 2019 sales, and increased new store openings.  These statements were false when made, and D'Annunzio knew them to be false when made.  As D'Annunzio admitted via text message to D'Angelo the following day, he intended that email to "finalize the closure" of the mouths of JDS shareholders who were complaining.

59.     Restive shareholders have remained an issue, as JDS has failed to meet its self-declared target of going public or being purchased at multiples of its private share price.  Indeed, on May 28, 2021, Williams emailed investors a letter drafted, upon information and belief, by DeVito, that contained not-so-veiled threats about the importance of keeping quiet and that they were  in "the final stages of our JDS journey."

60.     But this letter itself was yet more misinformation provided to shareholders like Plaintiffs.  While Plaintiffs now believe that Williams is an employee of JDS (as D'Annunzio stated under oath in 2020), and that WFCG is an otherwise inactive company run by Williams from his apartment primarily to serve JDS's and D'Annunzio's purposes, in all events WFCG had no legal ability to facilitate the sale of JDS at any time, because neither Williams nor WFCG had a brokerage license, and could not legally transact business issuing, trading, or selling securities.

61.     Yet D'Annunzio and Williams had previously misrepresented to Plaintiffs that Williams and his company, WFCG, were the authorized broker-dealers engaged and qualified to handle the private placement of shares in JDS.  These fraudulent statements were made to induce Plaintiffs to invest in JDS.

62.     However, given the D'Annunzio brothers' checkered history with D'Annunzio Distribution, Inc. and D'Annunzio Dealers, Inc., and the glaring, multiple irregularities set forth herein, D'Annunzio, Williams and the other defendants could not have honestly and reasonably believed that they could achieve a sale or initial public offering ("IPO") of JDS—let alone at many multiples of the share price at which Plaintiffs invested.

63.     Moreover, upon information and belief, D'Annunzio has no potential buyer seriously interested in purchasing JDS, and has never had such a buyer.  Rather, D'Annunzio has intended to keep recruiting new "investors," while pushing back time and again the date of the

promised sale or IPO.  Indeed, to this day, JDS has not been sold, and remains a privately-held company.  There has been no IPO, and upon information and belief, none is impending.

64.     Moreover, neither Williams nor his company, WFCG, have held a securities license at any relevant time.  Williams was not, in fact, working to take JDS public, but rather he was collecting fees for processing transactions, and providing fraudulent paperwork to investors.

65.     Nor is there any realistic prospect for dissatisfied investors to redeem their shares, despite representation to the contrary made in a presentation distributed to shareholders on or about July 22, 2022.  In that presentation, JDS stated that it was closing on major financing in the fall of 2022, and that a portion of that financing would be available to buy back shares from investors who wanted out.  This financing was supposed to be completed in the fall of 2022, but, upon information and belief, it has not been completed (if, indeed, it was ever truly in prospect).

66.     That major financing is in the cards for JDS appears doubtful, in the extreme.  The general economy is shaky, and lenders performing due diligence for major funding would likely be wary of the D'Annunzio brothers, in light of the *Capstone* debacle.  Even before the COVID-19 pandemic struck, D'Annunzio begged D'Angelo for short-term loans—none of which were repaid.  On at least two occasions, checks tendered to shareholders to buy back their shares bounced.

67.     JDS investors, in all events, have been and continue to be stiff-armed;  and, whereas in the past, they were forbidden to direct inquiries or complaints to anyone other than D'Annunzio or Williams, at present neither the Plaintiffs, nor upon information others who bought shares through the private placement, are able to reach D'Annunzio, Williams, or anybody else in JDS management.  E-mails go to a generic JDS mailbox, and upon information and belief, are met with no response.

68.     No checks or wire transfers have been issued to Plaintiffs to allow them to recoup their investments.

**C.      D'Angelo Gets Recruited to Participate
In the Supposed Opportunity to Invest in JDS**

69.     D'Angelo was introduced to the "opportunity" to invest in JDS by DeVito during a meeting to discuss property located at 4179 Hylan Boulevard on Staten Island.

70.     On or about February 12, 2017, DeVito invited D'Angelo to a luncheon meeting, which D'Angelo attended and at which D'Annunzio pitched an investment in JDS as a friends-and-family, better-strike-while-the-iron-is-hot opportunity, that promised extraordinary gains.  At this meeting, D'Annunzio made the core claims underlying the private placement:  that he was the scion of a distinguished, more than 60-year-old family business, and that early entrants into the JDS fold were guaranteed to quadruple their money, or more, via either an IPO or a lucrative sale of the company, within 2.5 years.

71.     The following day, D'Annunzio sent promotional materials to D'Angelo, urging him to "keep this between us."  This material showed a consistent record of sales topping projections by nearly 100%, exponential growth, and was delivered in connection with statements that D'Annunzio wanted to keep this a "friend and family"-only opportunity.

72.     On February 14, 2017, D'Annunzio told D'Angelo that he (D'Annunzio) had "pre-purchased shares" for D'Angelo at a discount, and that JDS would be sold for at least $20/share. Before D'Angelo invested in JDS, D'Annunzio represented to him that in valuing a jewelry company for sale, a purchaser will determine a certain value, then typically multiply it by 3-8x, or three to eight times.  Pointing to a recent sale of a famous fashion company, D'Annunzio told D'Angelo that this company had sold for a 28x multiple, but it did not have 18-20 patents like JDS supposedly did, which made a 28x multiple low for a sale of JDS.  In connection with these false

statements, D'Annunzio sent D'Angelo via mail or by a means or instrumentality in interstate commerce, a Stock Purchase Agreement, and a pre-completed Accredited Investor Questionnaire. D'Annunzio urged D'Angelo to act quickly.  DeVito added that the investment was "a golden opportunity" and that D'Annunzio was a "salt of the earth guy."

73.     D'Annunzio knew or should have known that these statements were false when made, because JDS had no prospects of being sold at the time, and these statements were part of a long-running (since 2011) scheme by D'Annunzio to raise money from "investors" who would never see that money again, for the reasons articulated above.  Moreover, JDS was not a 60-plus year old company, and D'Annunzio had no buyer or underwriter for JDS on the horizon.

74.     Based on these misrepresentations, D'Angelo began acquiring stock in JDS via wire transfers, "flips," and "residuals."  The first such wire transfer, in the amount of $100,000, occurred on February 17, 2017.  This was the first down payment in what would amount to millions of dollars D'Angelo transferred in exchange for stock in JDS.

75.     D'Angelo's investment in JDS occurred through two companies: SPG and Steveline.

**D.     Investments in JDS Via SPG Sheridan Group LLC**

76.     DeVito formed SPG Sheridan Group LLC to, among other things, enrich himself using D'Angelo's money.  Indeed, he drafted all of the legal documents for that entity, in which he, D'Angelo, and non-party Graci are the only members.  That legal documentation allows D'Angelo, as a managing member of SPG, to commence suit on its behalf without the need for a demand upon the entity and without the consent of the other two members, DeVito and Graci.

77.     On March 31, 2017, at a special meeting of SPG, the members of that entity (D'Angelo, DeVito, and non-party Graci) resolved that, upon the sale of stock in JDS, such

member(s) who had contributed funds to purchase said stock would be reimbursed for the monies that were used to purchase the JDS stock, and any excess monies would be divided equally among the members of SPG.  Thus, DeVito arranged for D'Angelo to bear all the risk of loss, while DeVito participated only in the upside of any purported investment in JDS.

78.     DeVito thus drafted self-dealing documents, and failed to advise D'Angelo that, among other things, he should seek the advice of an independent attorney, before entering into a business transaction with DeVito.

79.     D'Angelo contributed 100% of the moneys used to purchase the stock in JDS by SPG.  This included, without limitation, repeated six-figure transfers to PPAD's bank account to purchase stock in JDS.

80.     For example, and without limitation, on February 27, 2017, D'Angelo transferred $200,000 to PPAD's account to purchase shares in JDS.  Subsequently, additional transfers in amounts of up to $500,000 per transfer were sent to PPAD's bank account to purchase shares in JDS.

81.     Additionally, on March 31, 2017, at a special meeting of SPG, the members resolved to loan monies to PPAD to generate monthly income ("Residuals") that would result in payments of $2,500/month to each individual member of SPG, as well as a $2,500/month additional investment in JDS stock by SPG.

82.     Thereafter, in or about July 2018, payments of Residuals to D'Angelo ceased without D'Angelo's consent or agreement, and said Residuals remain due and owing as of February 2023 and continuing, with interest running at New York's statutory rate.

83.     SPG also invested in JDS stock using D'Angelo's money to participate in "flips" via PPAD.  The money from these flips was supposed to be paid out in part to D'Angelo, and a portion was to be reinvested in JDS stock in the name of SPG.

84.     One such example of a "flip" occurred in August 2017.   In that instance, D'Annunzio told D'Angelo that he had come across a "flip" that would yield 4-5 times the amount invested.   This statement induced D'Angelo to transfer $170,000 to PPAD to participate in this flip.

85.     According to D'Annunzio, this flip produced a profit of $400,000 to be invested into JDS stock, $300,000 in profit to be paid out to D'Angelo, and $50,000 in profit to be paid out to DeVito.  Additionally, D'Angelo was to be repaid the $170,000 he advanced to participate in this flip.

86.     To date, D'Annunzio and PPAD continue to wrongfully withhold the entire profit from this flip owed to D'Angelo, and have not returned to D'Angelo at least $100,000 of the $170,000 in principal used to fund this flip, despite due demand for same.

87.     Simply put, D'Annunzio and PPAD owe D'Angelo at least $400,000 on this August 2017 flip alone.

88.     In connection with the aforementioned wire transfers, flips, and residuals JDS issued to SPG a stock subscription agreement, reflecting a purchase of 300,500 shares of JDS by SPG.

**E.   Investments in JDS via Steveline, Inc.**

89.     D'Angelo also holds shares in JDS through his wholly-owned company, Steveline, Inc.

90.     Steveline's investments in JDS were all made from a combination of principal and profits from flips performed by PPAD.

91.     Beginning in July 2017, D'Angelo, on Steveline's behalf, transferred hundreds of thousands of dollars to PPAD.  For example, on July 7, 2017, D'Angelo transferred $100,000 to PPAD to participate in a flip that (according to D'Annunzio) would yield a 30% profit.  This $130,000 was then invested in JDS stock.

92.     These transfers to PPAD to participate in flips occurred throughout 2017 and 2018.

93.     As a result of these investments by Steveline, in mid-November of 2018, JDS issued Steveline stock subscription agreements reflecting that Steveline held 120,000 shares of JDS.

94.     Steveline would not have become an investor in JDS, but for D'Annunzio's misrepresentations to D'Angelo, as set forth above.

**F.     D'Angelo Loans Money to JDS, PPAD, and D'Annunzio**

95.     In addition to enticing him to invest in JDS, D'Annunzio has treated D'Angelo akin to an ATM, asking for hundreds of thousands of dollars to cover supposed shortfalls in JDS's bank account without repaying D'Angelo for these amounts.

96.     D'Angelo and/or Steveline loaned JDS $275,000 through April 20, 2020, none of which has been repaid as of the date hereof (the "First Loan").

97.     The First Loan was made through several smaller transfers.  For example, on January 22, 2020, D'Annunzio asked D'Angelo for a "huge favor" to supposedly help him cover $320,000 for a retailer's goods due by 10 a.m. the next day.  D'Annunzio promised D'Angelo that he would wire back this money and another $15,000 in additional money D'Angelo had loaned him via PPAD.  Both of these statements were lies.

98.     Indeed, on February 3, 2020, D'Annunzio again texted D'Angelo, stating that he was short an additional $45,000 to cover payment for this same retailer's goods.   Believing D'Annunzio's word, D'Angelo wired PPAD $45,000 as a loan.

99.     On the morning of February 7, 2020, D'Annunzio again asked D'Angelo for money—this time in the amount of $39,000 by 10:00 a.m.   To induce D'Angelo to make this transfer, D'Annunzio texted D'Angelo that his "bank held two checks totaling 385k" and that these checks "will clear by Tuesday so then I can send you what you sent previous[ly]."   Once again, D'Annunzio knew his statement to be false when made, inasmuch as he had no intention of repaying D'Angelo and, upon information and belief, the bank was not holding two checks totaling $385,000 for D'Annunzio or his companies.

100.     D'Annunzio, JDS, and PPAD have failed to repay D'Angelo amounts loaned to them, and accordingly, interest on the First Loan has been accruing at 16% per annum.

101.     D'Annunzio has acknowledged that this $275,000, provided by Steveline, is on JDS's books as a loan, but has dodged efforts by D'Angelo to collect these funds.

102.     Additionally, from July 2020 through July 2021, D'Angelo transferred an additional $225,000 to JDS and D'Annunzio in the form of loans (collectively, the "Second Loan").

103.     These amounts also have not been repaid, despite D'Angelo's repeated requests for repayment.

104.     JDS and D'Annunzio have failed to repay D'Angelo amounts loaned to them, and accordingly, interest on the Second Loan has been accruing at 16% per annum.

105.     Additionally, on November 16, 2018, D'Angelo transferred $150,000 to PPAD for use as a construction loan (the "Construction Loan").   The anticipated profit was to be $60,000.

This loan has not been repaid to D'Angelo despite being overdue and despite D'Angelo demanding repayment.

106.    By the summer of 2021, D'Angelo had made significant investments in JDS, but needed cash to pay for his upcoming wedding.  Therefore, D'Angelo requested repayment of at least some of the money he had loaned to JDS from D'Annunzio, whom he believed to be his friend.  D'Annunzio, despite repeatedly promising to wire D'Angelo some of his loaned funds, repeatedly failed to do so.

107.    Once D'Annunzio realized he could not keep seeking hundreds of thousands of dollars from D'Angelo without repayment, D'Annunzio mostly stopped returning D'Angelo's calls, and became generally unresponsive to D'Angelo's text messages.

108.    In total, D'Angelo has loaned a combination of JDS, PPAD, and D'Annunzio at least $650,000 in principal that has not been repaid—let alone repaid with interest.

**G.    Rubin Invests in JDS, Tries to Redeem
His Shares, and Is Then Further Defrauded**

109.    On or about June 29, 2019, Williams contacted Rubin about the opportunity to invest in JDS.

110.    Based on representations made by Williams that, among other things, (i) JDS had been in business since 1955 and was "accredited and established," (ii) JDS was in discussions to sell the company at $100 per share with Tiffany's, Berkshire Hathaway, and Chow Tai Fook Jewelry Group Limited, and (iii) Rubin would be provided a prospectus that showed extremely high margins and increasing growth over the past five years Rubin transferred $33,000 to PPAD. This money was supposed to be invested in JDS, and was sent to a TD Bank account ending in -7252 ostensibly belonging to PPAD.  Williams confirmed in writing that this was the correct transferee information.

111.    On September 26, 2019, Williams again approached Rubin seeking an additional investment. At 3:22 p.m. on that day, Williams represented to Rubin that "JDS has the opportunity to expand into twice the amount of locations than originally projected . . . To accomplish this added expansion I want to release some additional shares from the original base of shares that have not been sold yet" and that this was to be accomplished by having "each shareholder work with [Williams] to refer certain family, friends, or contacts and invite them to learn about this special opportunity." Upon information and belief, this email was ghostwritten by D'Annunzio, with input from DeVito.

112.    As it turns out, the money raised from this solicitation was not used to expand JDS's footprint into twice the amount of locations. This representation was false, and Williams knew it to be false when made.

113.    At the end of 2019, Williams again asked for further investment in JDS from Rubin. Rubin indicated that he needed a few additional days to come up with the money, but Williams responded that the opportunity would only be held open if Rubin made a partial payment by the end of the year. Accordingly, Rubin scraped together the last of his life savings, and transferred what he could to PPAD to purchase additional shares in JDS stock.

114.    Sean Williams then squeezed Rubin for further "investment" by indicating that he would "ask for an extension from the attorney" to hold open this opportunity until January 2, 2020. Upon information and belief, that attorney was DeVito, and accordingly DeVito knew of Williams' statements to Rubin and acted in concert with Williams to finish draining Rubin's life savings.

115.    As a result of Williams' statements, Rubin transferred the remainder of his life savings, and proceeds from the sale of his car, to WFCG to purchase JDS stock. Unbeknownst to

Rubin, the money he invested in JDS was, upon information and belief, being used to redeem shares of earlier investors in JDS who were threatening to sue.

116.    Defendants did not provide any investment documentation to Rubin before he purchased this additional tranche of shares in JDS.  When documentation was provided, that documentation, which was completed by Williams, indicated that Rubin was an accredited investor, which he is not.

117.    On or about July 23, 2020, Rubin faced a cash shortage, and thus inquired about exiting his investment in JDS.

118.    Williams discouraged such a move, writing to Rubin that to exit the JDS investment, "[t]he minimum is 6 months but can take much longer than that.  I don't advise trying to get out of JDS."

119.     Williams knew that this representation about the time it took to redeem shares in JDS was false when he made it, and he intended Rubin to rely on the statement, and not pursue a share redemption request.

120.    Williams' gambit worked, at least for a while, and Rubin did not immediately pursue a share redemption.  However, in or about August 2020, Rubin formally requested to redeem his shares in JDS.

121.     Thereafter, Williams became unresponsive to Rubin's repeated inquiries about share redemption, and told Rubin he would address the request in 2021.

122.    In January 2021, Williams continued to dodge Rubin's requests for share redemption and referred Rubin to DeVito, who was similarly unresponsive.

123.    On October 10, 2021, Williams, acting at D'Annunzio's direction and with D'Annunzio's knowledge, represented to Rubin in a phone call that JDS was in advanced discussions to be purchased by Berkshire Hathaway or 1-800-Flowers.

124.    This statement was false and Williams knew it to be false when made.  To the extent, if any, that there may have been discussions with Berkshire Hathaway or 1-800-Flowers, they were nothing more than conversations expressing a hope that JDS could collaborate with these companies.

125.    Nonetheless, Williams and WFCG knew that these statements were false when made, and they were intended to prevent Rubin from pursuing his redemption request at that time.

126.    In this regard, Defendants were successful, and they repeated this tactic again on February 28, 2022, representing to Rubin once again that JDS was in talks with two new companies for JDS to be acquired and that Rubin would be foolish to redeem his shares in JDS just before JDS was about to be purchased by a third party.

127.    Once again, these statements were false, and Williams and WFCG knew them to be false when made.  These statements, like Williams' prior statements about Berkshire Hathaway and 1-800 Flowers, were intended to prevent Rubin from redeeming his shares in JDS.

128.    On or about April 13, 2022, Rubin realized that multiple parties who were supposedly interested in buying JDS had walked away.  He thus concluded that it was unlikely that JDS was going to be purchased—let alone at the $100/share that Sean Williams had represented was in the works during their phone calls.

129.    Accordingly, on April 14, 2022, Rubin once again demanded redemption of his shares in JDS.  Once again, Defendants ignored Rubin's requests.

H.   **Events Leading Up to This Litigation**

130.    On or about July 6, 2022, Plaintiffs served a demand to inspect JDS's books and records, as is their right under Delaware law.  Among other items, the Demand to Inspect Books and Records sought complete financial statements for JDS so that Plaintiffs could determine, among other things, if representations made to them by D'Annunzio, Williams, JDS, and WFCG were truthful—especially in light of JDS's seemingly chronic cash flow problems.  D'Angelo also sought to confirm that the loans he made to JDS were properly recorded on its books to ensure repayment of same.  To date, <u>none</u> of the requested records have been turned over to Plaintiffs.

131.    In the hopes of avoiding this litigation, Plaintiffs entered into a tolling agreement effective as of July 8, 2022.  This tolling agreement has been subsequently extended through and including the date of filing of this Complaint.

132.    Unfortunately, it has become apparent that litigation is necessary, given Defendants' continued stalling and unwillingness to provide information.

<u>AS AND FOR A FIRST CLAIM FOR RELIEF</u>

**(Against All Defendants Except Rosenblum, for Fraud in Connection with the Purchase or Sale of Securities in Violation of Section 10(b) of the Securities Exchange Act and Rule 10b-5 Thereunder)**

133.    Plaintiffs repeat, reiterate, and reallege the allegations contained in paragraphs 1 through 132 above, with the same force and effect as if set forth at length herein.

134.    Defendants D'Annunzio, JDS, PPAD, DeVito, D&D, Williams, and WFCG, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails, with scienter:

a.    employed devices, schemes, or artifices to defraud;

b.    made untrue statements of material fact or by omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

c.    engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

135.    By engaging in the conduct described above, defendants D'Annunzio, JDS, PPAD, DeVito, D&D, Williams, and WFCG violated, and unless restrained and enjoined, will continue to violate, Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.  Moreover, defendants' D'Annunzio, JDS, PPAD, DeVito, D&D, Williams, and WFCG's actions in violation of Section 10(b) of the Securities Exchange Act and Rule 10b-5 thereunder have caused Plaintiffs, and each of them, to incur damages, in amounts to be proved at trial, but reasonably believed to exceed $3,600,000.

136.    In addition to the foregoing relief, defendants D'Annunzio, JDS, PPAD, DeVito, D&D, Williams, and WFCG and each of them should be preliminarily and permanently enjoined from continuing or repeating their conduct, as the Court shall determine to be in violation of Section 10(b) of the Securities Exchange Act, and Rule 10b-5 thereunder.

## <u>AS AND FOR A SECOND CLAIM FOR RELIEF</u>

**(Against D'Annunzio, Williams, and WFCG, for the Unregistered Offer and Sale of Securities in Violation of Sections 5(a) and 5(c) of the Securities Act)**

137.    Plaintiffs repeat, reiterate, and reallege the allegations contained in paragraphs 1 through 136 above, with the same force and effect  as if set forth at length herein.

138.    D'Annunzio, Williams, and WFCG, by engaging in the conduct described above, directly or indirectly, made use of means or instrumentalities of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such

securities to be carried through the mails or in interstate commerce, for the purpose of sale or delivery after sale.

139.    No registration statement has been filed with the Securities Exchange Commission or has been in effect with respect to the offering alleged herein.

140.    By engaging in the conduct described above, D'Annunzio, Williams, and WFCG have violated, and unless restrained and enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).  The conduct of D'Annunzio, Williams, and WFCG has caused Plaintiff damages in amounts to be determined at trial, but reasonably believed to exceed $3,600,000.

141.    In addition to the foregoing relief, defendants D'Annunzio, Williams, and WFCG and each of them should be preliminarily and permanently enjoined from continuing or repeating their conduct, as the Court shall determine to be in violation of  Sections 5(a) and 5(c) of the of the Securities Act.

## AS AND FOR A THIRD CLAIM FOR RELIEF

### (Against D'Annunzio, JDS, Williams, and DeVito for Fraudulent Inducement)

142.    Plaintiffs repeat, reiterate, and reallege the allegations contained in paragraphs 1 through 141 above, with the same force and effect as if set forth at length herein.

143.    Throughout the parties' relationships, and as set forth above, D'Annunzio, JDS, Williams, and DeVito made numerous material misrepresentations of material fact to Plaintiffs. They also omitted material facts in their discussions with Plaintiffs that could make their communications non-misleading, as set forth above.

144.    D'Annunzio, JDS, Williams, and DeVito knew when they made the representations described herein that those representations were false, and they knew when they omitted material facts that these omissions made their communications misleading.

145.    D'Annunzio, JDS, Williams, and DeVito made their false representations and omissions in order to induce Plaintiffs to invest and reinvest in JDS, participate in flips with no intention of repaying Plaintiffs, to prevent Plaintiffs from redeeming their shares in JDS, and to secure loans from D'Angelo and Steveline that they had no intention of repaying.

146.    Plaintiffs reasonably relied upon the material misrepresentations and omissions of D'Annunzio, JDS, Williams, and DeVito.

147.    As a direct and proximate result of the material misrepresentations of D'Annunzio, JDS, Williams, and DeVito, Plaintiffs have been damaged in amounts to be proved at trial, but not less than $5,000,000.

## AS AND FOR A FOURTH CLAIM FOR RELIEF

**(Against Williams, WFCG, Rosenblum, DeVito, and D&D for Aiding and Abetting Fraud)**

148.    Plaintiffs repeat, reiterate, and reallege the allegations contained in paragraphs 1 through 147 above, with the same force and effect as if set forth at length herein.

149.    Defendants Williams, WFCG, Rosenblum, DeVito and D&D had actual knowledge of D'Annunzio's scheme to defraud Plaintiffs and others like them.

150.    Defendants Williams, WFCG, DeVito and D&D provided substantial assistance to D'Annunzio and JDS in their scheme by, among other things, drafting and backdating fraudulent documents, and issuing unregistered securities in JDS.

151.     DeVito and D&D provided substantial assistance to D'Annunzio and JDS in their scheme by threatening persons who purchased shares in JDS with reprisals if they "blew the whistle" or insisted on redeeming their shares, and ghostwriting materially misleading communications to shareholders.

152.    Defendant Rosenblum provided substantial assistance to D'Annunzio and JDS in their fraudulent scheme by, among other things, maintaining the books and records for "flip"

transactions he knew that D'Annunzio, PPAD, and JDS were using to steal additional funds from JDS investors such as D'Angelo.

153.    Defendants Williams, WFCG, Rosenblum, DeVito and D&D are thus liable to Plaintiff as aiders and abettors of the fraudulent scheme described in this Complaint in an amount to be determined at trial, but reasonably believed to exceed $5,000,000.

## AS AND FOR A FIFTH CLAIM FOR RELIEF

### (Against D'Annunzio for Breach of Fiduciary Duties)

154.    Plaintiffs repeat, reiterate, and reallege the allegations contained in paragraphs 1 through 153 above, with the same force and effect as if set forth at length herein.

155.    As President and CEO of JDS, a closely-held corporation, D'Annunzio owed his minority shareholders, including each of the Plaintiffs, fiduciary duties.

156.    The fiduciary duties owed by D'Annunzio included, but were not limited to, duties of care, loyalty, trust, good faith, and fair dealing to Plaintiffs.

157.    In violation of these fiduciary duties, and as described more fully herein, D'Annunzio repeatedly misrepresented to Plaintiffs JDS's financial affairs and his plans for the company's future, among other material facts.

158.    As a direct and proximate result of the conduct alleged herein, Plaintiffs have suffered severe economic injury in an amount to be determined at trial, but reasonably believed to exceed $5,000,000.

## AS AND FOR A SIXTH  CLAIM FOR RELIEF

### (Against Williams, WFCG, DeVito, and D&D for Aiding and Abetting Breach of Fiduciary Duties)

159.    Plaintiffs repeat, reiterate, and reallege each of the allegations contained in paragraphs 1 through 158 above, with the same force and effect as though set forth at length herein.

160.    Williams and WFCG knew that D'Annunzio owed fiduciary duties to shareholders such as Rubin, SPG, and Steveline.

161.    Williams and WFCG further knew that the basis for such investments, namely that JDS was going to achieve an initial public offering and other similar representations to shareholders, was not true.

162.    Nonetheless, Williams and WFCG knowingly participated in the breach of these fiduciary duties by spreading these falsehoods so that it could collect commissions on share purchases, incorrectly completing Accredited Investor Questionnaires, and backdating various shareholder-related documents.

163.    As a result of Williams' and WFCG's aiding and abetting of D'Annunzio' breach of fiduciary duties, Plaintiffs have suffered damages in an amount to be proven at trial, but reasonably expected to exceed $3,600,000.

164.    Similarly, DeVito and D&D knowingly facilitated D'Annunzio's numerous breaches to shareholders such as Rubin, SPG, and Steveline.

165.    DeVito and D&D knew that D'Annunzio owed fiduciary obligations to shareholders of JDS.

166.    DeVito and D&D further knew that many of the representations made to shareholders as described herein were false and that JDS had no realistic prospect of achieving an initial public offering or otherwise being sold at multiples of share prices at which investors purchased their shares.

167.    Nonetheless, DeVito and D&D aided and abetted D'Annunzio's breaches of fiduciary duties by drafting false communications to shareholders for use by D'Annunzio, stalling share redemption requests, and acting as D'Annunzio's "enforcer," including by threatening

shareholders who questioned the information they received with lawsuit for breach of a non-disclosure agreement.

168.    As a result of DeVito's and D&D's actions, Plaintiffs suffered damages in an amount to be proven at trial, but reasonably expected to exceed $5,000,000.

**AS AND FOR A SEVENTH CLAIM FOR RELIEF**

**(Against DeVito and D&D for Breach of Fiduciary Duties)**

169.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 168 above, with the same force and effect as if set forth at length herein.

170.    As D'Angelo's attorneys, DeVito and D&D owed their client fiduciary duties.

171.    The fiduciary duties owed by DeVito and D&D included, but were not limited to, duties of care, loyalty, trust, good faith, and fair dealing to Plaintiffs.  In addition, DeVito and D&D had a duty not to engage in self-dealing.

172.    In violation of these fiduciary duties, and as described more fully herein, DeVito and D&D engaged in self-dealing and failed to disclose material information about the scams they were helping D'Annunzio, JDS, and PPAD perpetrate against JDS shareholders.

173.    As a direct and proximate result of the conduct alleged herein, D'Angelo, Steveline, and SPG have suffered severe economic injury in an amount to be determined at trial, but reasonably believed to exceed $3,600,000.

**AS AND FOR AN EIGHTH CLAIM FOR RELIEF**

**(Against Williams and WFCG for Breach of Fiduciary Duties)**

174.    Plaintiffs repeat, reiterate, and reallege each of the allegations contained in paragraphs 1 through 173 above, with the same force and effect as if set forth at length herein.

175.    As a broker of securities, Williams and his alter ego WFCG owed its clients such as Rubin, Steveline, and SPG, the highest duties of care and loyalty.

176.   Williams and WFCG breached these duties of care and loyalty by, among other things, failing to disclose that JDS had no serious discussions about an initial public offering and no realistic path toward achieving same.

177.   As a direct and proximate result of Williams' and WFCG's breaches of fiduciary duties, Plaintiffs suffered damages in an amount to be determined at trial, but reasonably expected to exceed $3,600,000.

## AS AND FOR A NINTH CLAIM FOR RELIEF

### (Against D'Annunzio and PPAD for Conversion Relating to "Flips")

178.   Plaintiffs repeat, reiterate, and reallege each of the allegations contained in paragraphs 1 through 177 above, with the same force and effect as if set forth at length herein.

179.   As set forth above, Steveline repeatedly transferred funds to PPAD for the purpose of participating in various flips.  Each transfer was a discrete amount of money and was intended to be repaid as principal and profit.

180.   Steveline has demanded repayment of the principal and profits for the funds transferred to PPAD to participate in flips, which money rightfully belongs to Steveline.

181.   Nonetheless, D'Annunzio and PPAD have continued to exercise unauthorized dominion over these funds in its possession despite demand for their return to the exclusion of Steveline's rights.

182.   As a result of the foregoing conduct, Steveline has been damaged in an amount to be proven at trial, but reasonably expected to exceed $1,900,000.

## AS AND FOR A TENTH CLAIM FOR RELIEF

### (Against D'Annunzio, JDS, and PPAD for Conversion in Connection with Monies Loaned)

183.   Plaintiffs repeat, reiterate, and reallege each of the allegations contained in paragraphs 1 through 182 above, with the same force and effect as if set forth at length herein.

184.     As set forth above, D'Angelo repeatedly loaned funds to JDS and D'Annunzio at the behest of D'Annunzio, including by transferring said funds to PPAD.

185.     D'Angelo retained legal ownership of these monies loaned to JDS and D'Annunzio.

186.     D'Angelo expected repayment of the loans and has demanded that the funds be repaid.

187.     Defendants continue to exercise unlawful dominion and control over the funds loaned to JDS and D'Annunzio.

188.     As a result of the foregoing, D'Angelo has suffered damages in an amount to be proven at trial, but reasonably expected to exceed $845,000.

## AS AND FOR AN ELEVENTH CLAIM FOR RELIEF

### (Against D'Annunzio, JDS, and PPAD for Unjust Enrichment)

189.     Plaintiffs repeat, reiterate, and reallege each of the allegations contained in paragraphs 1 through 188 above, with the same force and effect as if set forth at length herein.

190.     As set forth above, D'Annunzio, JDS, and PPAD all received significant sums of money from Plaintiffs in connection with various material misrepresentations and omissions.  As such, they were unjustly enriched.

191.     Defendants D'Annunzio, JDS, and PPAD received this money at Plaintiffs' expense.

192.     It would be against equity and good conscience for D'Annunzio, JDS, and PPAD to keep such funds.

193.     As a result of the foregoing, Plaintiffs have suffered damages in an amount to be proven at trial, but reasonably expected to exceed $5,000,000.

## AS AND FOR A TWELFTH CLAIM FOR RELIEF

### (Against D'Annunzio, JDS, and PPAD for Constructive Trust)

194.    Plaintiffs repeat, reiterate, and reallege each of the allegations contained in paragraphs 1 through 193 above, with the same force and effect as if set forth at length herein.

195.    D'Annunzio, as an officer and controlling shareholder in JDS, stood in a confidential or fiduciary relationship with Plaintiffs.

196.    As a fiduciary, D'Annunzio owed duties including, but not limited to a duty of trust, confidentiality, good faith, fair dealing and loyalty.

197.    Based on these legal duties, D'Annunzio was obligated to use Plaintiffs' funds in a lawful and proper manner, for their exclusive benefit, and not for personal purposes.

198.    D'Annunzio repeatedly promised to use monies transferred by or on behalf of Plaintiffs to PPAD and JDS to fund flips, share purchases, residual income, and treat money so transferred as short-term loans.

199.    In reliance on D'Annunzio's repeated representations, D'Angelo, on behalf of SPG and Steveline, transferred millions of dollars to bank accounts belonging to PPAD and JDS to be used to fund flips, share purchases, residuals, and to be used as short-term loans.

200.    Said funds have not been used as promised, and money so transferred has not been repaid.  Rather, upon information and belief, D'Annunzio has pocketed these funds, and/or has used these funds to pay off restive shareholders and perpetuate the JDS Ponzi scheme.

201.    Plaintiffs would not have transferred or delivered said funds, had they known of D'Annunzio's, JDS's, and PPAD's intent to defalcate and otherwise misappropriate said funds.

202.    As a result of D'Annunzio's repeated defalcations and misappropriations of Plaintiffs' funds, he has breached his fiduciary and other legal duties owed to Plaintiffs.

203.    As a direct and proximate result of the conduct alleged herein, D'Annunzio, JDS, and PPAD have been unjustly enriched at Plaintiffs' expense.

204.    It is against equity and good conscience to allow D'Annunzio, JDS, and PPAD to retain the funds Plaintiffs transferred to them.

205.    By reason of the breaches of fiduciary duties and other legal duties, or the otherwise wrongful manner in which D'Annunzio handled Plaintiffs' funds on behalf of himself, JDS, and PPAD, D'Annunzio, JDS, and PPAD have no legal or equitable right, claim or interest therein to said funds, but are instead involuntary trustees holding unjustly obtained profits and assets belonging to Plaintiffs in a constructive trust for Plaintiffs, with a duty to convey the same to Plaintiffs forthwith.

### AS AND FOR A THIRTEENTH CLAIM FOR RELIEF
#### (Against D'Annunzio, JDS, and PPAD for an Accounting)

206.    Plaintiffs repeat, reiterate, and reallege each of the allegations contained in paragraphs 1 through 205 above, with the same force and effect as if set forth at length herein.

207.    D'Annunzio, as an officer and controlling shareholder in JDS, enjoyed a confidential or fiduciary relationship with Plaintiffs.

208.    As a fiduciary, D'Annunzio owed duties including, but not limited to a duty of trust, confidentiality, good faith, fair dealing and loyalty.

209.    Based on these legal duties, D'Annunzio was obligated to use Plaintiffs' funds in a lawful and proper manner, for their exclusive benefit, and not for personal purposes.

210.    D'Annunzio repeatedly promised to use monies transferred by or on behalf of Plaintiffs to PPAD and JDS to fund flips, share purchases, residual income, and treat money so transferred as short term loans.

211.    In reliance on D'Annunzio's repeated representations, D'Angelo, on behalf of SPG and Steveline, transferred millions of dollars to bank accounts belonging to PPAD and JDS to be used to fund flips, share purchases, residuals, and to be used as short-term loans.

212.    Said funds have not been used as promised, and money so transferred has not been repaid.  Rather, upon information and belief, D'Annunzio has pocketed these funds or use these funds to pay off restive shareholders.

213.    Plaintiffs would not have transferred or delivered said funds had they known of D'Annunzio's, JDS's, and PPAD's intent to defalcate and otherwise misappropriate said funds.

214.    As a result of D'Annunzio's repeated defalcation and misappropriation of Plaintiffs' funds, he has breached his fiduciary and other legal duties owed to Plaintiffs.

215.    Plaintiffs have previously demanded an accounting, which demand was refused.

216.    As a direct and proximate result of the foregoing wrongful conduct, Plaintiffs do not have an adequate remedy at law absent an accounting to determine how D'Annunzio, JDS, and PPAD used their money given the complex series of transactions, including flips and residuals, known only to defendants.

### AS AND FOR A FOURTEENTH CLAIM FOR RELIEF
**(Against D'Annunzio and Williams for Negligent Misrepresentations)**

217.    Plaintiffs repeat, reiterate, and reallege each of the allegations contained in paragraphs 1 through 216 above, with the same force and effect as if set forth at length herein.

218.    As set forth more fully herein, D'Annunzio held a special, privity-like relationship with shareholders in JDS including Plaintiffs that imposed upon him a duty to impart correct information to Plaintiffs.

219.    Likewise, Williams, as a supposed securities broker for closely-held JDS had a duty to impart correct information to shareholders such as Rubin.

220.   In violation of these duties, D'Annunzio and Williams repeatedly imparted materially incorrect and misleading information to Plaintiffs as set forth above.

221.   Plaintiffs, believing repeated representations about JDS's supposed success and that it was "close" to achieving a sale of the business or a public offering, held off seeking redemption of their shares in JDS.

222.   Unbeknownst to Plaintiffs at the time the representations described in this complaint were made to them, they were false.

223.   Plaintiffs reasonably relied upon D'Annunzio's and Williams' misrepresentations.

224.   As a direct and proximate result of the foregoing negligent misrepresentations, Plaintiffs have been damaged in an amount to be determined at trial, but reasonably believed to exceed $5,000,000.

WHEREFORE, Plaintiffs demand judgment as follows:

a. On Plaintiffs' FIRST Claim for Relief, an Order enjoining defendants D'Annunzio, JDS, PPAD, DeVito, D&D, Williams, and WFCG from violating Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, as well as awarding a judgment against defendants D'Annunzio, JDS, PPAD, DeVito, D&D, Williams, and WFCG, jointly and severally, and in favor of all and each of the Plaintiffs, in amounts to be determined at trial, but reasonably believed to exceed $3,600,000;

b. On Plaintiff's SECOND Claim for Relief, an Order enjoining defendants D'Annunzio, Williams, and WFCG from violating Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c), as well as awarding a judgment in Plaintiffs' favor and against defendants D'Annunzio, Williams, and WFCG, jointly and severally, in amounts to be determined at trial, but reasonably believed to exceed $3,600,000;

c. On Plaintiff's THIRD Claim for Relief (fraudulent inducement), an Order awarding a judgment in Plaintiffs' favor and against defendants D'Annunzio, JDS, Williams, and DeVito, jointly and severally, in amounts to be determined at trial, but reasonably believed to exceed $5,000,000;

d. On Plaintiff's FOURTH Claim for Relief (aiding and abetting fraud), an Order

awarding a judgment in Plaintiffs' favor and against defendants Williams, WFCG, Rosenblum, DeVito, and D&D, jointly and severally, in amounts to be determined at trial, but reasonably believed to exceed $5,000,000;

e.   On Plaintiffs' FIFTH Claim for Relief (breach of fiduciary duties), an Order awarding a judgment in Plaintiffs' favor and against defendant D'Annunzio in amounts to be determined at trial, but reasonably believed to exceed $5,000,000;

f.   On Plaintiffs' SIXTH Claim for Relief (aiding and abetting breach of fiduciary duties), an Order awarding a money judgment in favor of Plaintiffs against defendants Williams, WFCG, DeVito, and D&D, jointly and severally, in amounts to be determined at trial, but reasonably believed to exceed $5,000,000;

g.   On Plaintiffs' SEVENTH Claim for Relief (breach of fiduciary duties), an Order awarding a judgment in D'Angelo, Steveline, and SPG's favor and against defendants DeVito and D&D, jointly and severally, in an amount to be determined at trial, but reasonably believed to exceed $3,600,000;

h.   On Plaintiffs' EIGHTH Claim for relief (breach of fiduciary duties), an Order awarding a judgment in Plaintiffs' favor and against defendants Williams and WFCG, jointly and severally, in an amount to be determined at trial, but reasonably believed to exceed $3,600,000;

i.   On Plaintiffs' NINTH Claim for relief (conversion), an Order awarding a judgment in Plaintiffs' favor and against defendants D'Annunzio and PPAD, jointly and severally, in an amount to be determined at trial, but reasonably believed to exceed $1,900,000;

j.   On Plaintiffs' TENTH Claim for relief (conversion), an Order awarding a judgment in Plaintiffs' favor and against defendants D'Annunzio, JDS, and PPAD, jointly and severally, in an amount to be determined at trial, but reasonably believed to exceed $845,000;

k.   On Plaintiffs' ELEVENTH Claim for relief (unjust enrichment), an Order awarding a judgment in Plaintiffs' favor and against defendants D'Annunzio, JDS, and PPAD, jointly and severally, in an amount to be determined at trial, but reasonably believed to exceed $5,000,000;

l.   On Plaintiffs' TWELFTH Claim for relief (constructive trust), an Order requiring the imposition of a constructive trust in favor of Plaintiffs, consisting of all monies transferred by Plaintiffs to D'Annunzio, JDS, or PPAD, including all profits derived from the use of said monies, and to prevent unjust enrichment

to D'Annunzio, JDS, and PPAD, an Order that such monies be paid over to Plaintiffs;

m. On Plaintiffs' THIRTEENTH Claim for Relief (accounting), an Order directing D'Annunzio, JDS, and PPAD to provide Plaintiffs with an accounting;

n.  On Plaintiffs' FOURTEENTH Claim for relief (negligent misrepresentation), an Order awarding a judgment in Plaintiffs' favor and against defendants D'Annunzio and Williams, jointly and severally, in an amount to be determined at trial, but reasonably believed to exceed $5,000,000;

o. Awarding exemplary damages;

p. Awarding punitive damages;

q. Awarding pre-judgment and post-judgment interest on all amounts recovered;

r. Awarding Plaintiffs their costs, expenses, and reasonable attorneys' fees; and

s. Awarding such other, further and different relief as the Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs, and each of them, demand trial by jury as to all issues so triable.

Dated:          White Plains, New York
                February 20, 2023

                                CERMELE & WOOD LLP


                                By:   /s/ Benjamin M. Rattner
                                      Benjamin M. Rattner
                                      Geoffrey S. Pope
                                      *Attorneys for Plaintiffs*
                                      2 Westchester Park Drive, Suite 110
                                      White Plains, New York 10604
                                      (Tel.) 914.967.2753
                                      ben@cw.legal
                                      geoff@cw.legal